UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

KATHERINE WHITE,                    )
                                    )
        Plaintiff,                  )
                                    )        No. 5:14-CV-79-REW
v.                                  )
                                    )        MEMORANDUM OPINION AND
BOURBON COMMUNITY HOSPITAL,         )                ORDER
LLC,                                )
                                    )
        Defendant.                  )

*** *** *** ***

Defendant, Bourbon Community Hospital, LLC ("BCH"), moved for summary judgment on all claims made by Plaintiff, Katherine White. DE #32. Plaintiff responded, DE #34, and Defendant replied, DE #35. The motion is ripe for consideration. For the following reasons, the Court **GRANTS** Defendant's motion for summary judgment (DE #32). On this record, Kentucky's well-developed qualified privilege protects BCH from liability for the alleged defamatory statements. Plaintiff similarly does not make, or really even attempt, a *prima facie* case for an intentional infliction of emotional distress claim. Accordingly, Defendant is entitled to judgment as a matter of law.

I.      **Relevant Factual and Procedural Background**

White's complaint stems from allegedly defamatory statements made by BCH[1] personnel related to her discharge from BCH employment on March 5, 2012. Plaintiff generally claims that BCH falsely accused her of improperly accessing a BCH patient's protected health information and committing a "blatant HIPAA violation." She claims

---

[1] Plaintiff does not assert defamation claims against any of the individual hospital employees involved; she targets only the entity.

1

that her access of the protected health information of Patient A,[2] a co-worker at BCH, was the incidental result of her legitimate search for the protected health information of Patient B, a supposed former patient at BCH and a person with the same surname as Patient A. She further alleges that BCH's investigation into the matter was deficient.

At the time of her termination by BCH, White worked as a behavioral health technician at Stoner Creek, a mental health facility contained within the structure of BCH. DE #32-14 (White Dep.), at 1 (Dep. p. 100).[3] She mostly worked night shifts. *Id.* at 1, 39 (Dep. pp. 100, 138). As a behavioral health technician, White provided care to patients under the direct supervision of a Registered Nurse (RN). *Id.* at 1-2 (Dep. pp. 100-01); DE #32-15 (White Dep.), at 33 (Dep Ex. 4). Her duties also involved general paperwork and processing new referrals or admissions to Stoner Creek. DE #32-14, at 5 (Dep. p. 104). As part of her employment, Plaintiff received training on compliance with BCH's patient privacy policies and the Health Insurance Portability and Accountability Act ("HIPAA"). *Id.* at 9-10, 19-20 (Dep. pp. 108-09, 118-19).

On the night of February 29, 2012, White worked a shift in the Adult Behavioral Health Unit at Stoner Creek, along with April Peace, a Licensed Practical Nurse (LPN), Mike Howard, another behavior health technician, and an unnamed RN. *Id.* at 40-41 (Dep. pp. 139-140). White and BCH offer differing accounts of the events that led to White accessing Patient A's protected healthcare information. They do, however, agree on certain facts. Using BCH's health information management system known as HMS

---

[2] In order to protect the privacy interests of the non-party patients, the Court will utilize pseudonyms for the two patients whose information is relevant to the dispute. The patients' lack of stake or role in the case, and obvious privacy interest, justify concealing their identities from the public record. *See* DE #30 (Minute Entry), ¶ 4.

[3] The parties publicly filed depositions in redacted form per Court Order. DE #30, ¶ 5. The parties also submitted, and the Court reviewed, unredacted copies.

GUI, White viewed certain health information of Patient A. *Id.* at 51-52 (Dep. pp. 150-51); DE #32-8 (Peace Dep.), at 28. The information displayed upon accessing HMS GUI included (as to various occasions) Patient A's patient number, name, admission date, discharge date, billing date, and hospital service code. DE ##32-14, at 51 (White Dep. pp. 150); 32-7 (Sadler Dep.), at 17-18. The parties agree that BCH's privacy policies and HIPAA protected the accessed information.[4] DE #32-14, at 27 (Dep. p. 126); *id.* at 75 (Dep p. 174) ("Yes, this could be considered HIPAA information[.]"); DE #32-5 (Terrell Dep.), at 7, 11. Further, Patient A was not a patient at Stoner Creek, *id.* at 52 (Dep. p. 151), and White would not have properly accessed Patient A's information absent a specific reason arising from her job duties or responsibilities. *Id.* at 31-32 (Dep. pp. 130-31).

Additionally, the parties do not dispute how the HMS GUI system functions. Within HMS GUI, a hospital employee, having the requisite access, can search for health care records of past and current patients. DE #32-7 (Sadler Dep.), at 12. A basic search using the surname of a patient yields an initial results screen containing seven names. *Id.* at 14. The resulting names populate in alphabetical order by surname, then given name.

---

[4] HIPAA protects from unauthorized disclosure "individually identifiable health information," defined as "any information, including demographic information collected from an individual, that . . . is created or received by a health care provider . . . [and] relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and . . . identifies the individual[.]" 42 U.S.C. § 1320d(6). *See also* 45 C.F.R. § 160.103 ("Protected health information means individually identifiable health information: (1) Except as provide in paragraph (2) of this definition, that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium.")

*Id.* The initial results or "lookup" screen for HMS GUI populates seven names, even if less than seven patient names of the searched surname exist in the system. *Id.* at 16. For example, a search for the surname "Hardy" in a training program meant to replicate HMS GUI returns patients with five distinct surnames. *Id.* Similarly, a proper or improper search for patient "Smith" would yield seven lookup results for, potentially, several individuals named Smith.

Beyond these agreed facts, the parties' accounts diverge. According to White, at approximately 10:20 p.m. on February 29, she received a telephone call from Patient B requesting potential admission at the Stoner Creek facility.[5] DE #32-14 (White Dep.), at 42 (Dep. p. 141). Patient B stated he had previously been a patient at Stoner Creek. *Id.* Prior to White collecting additional information, Patient B abruptly ended the call and stated he would call back. *Id.* at 43 (Dep. p. 142). In an effort to expedite the intake and referral process, White alleges she entered Patient B's surname, which happens to be the same as Patient A's, into the HMS GUI system. *Id.* at 43-45 (Dep. pp. 142-44). The initial results screen populated seven entries: six for Patient A and one for an unrelated patient. *Id.* at 45, 51 (Dep. pp. 144, 150); DE #32-7 (Sadler Dep.), at 18, 68 (Dep p. 18, Ex. 4). White's search did not yield any results for Patient B. *Id.* Ultimately, according to White, Patient B did not call back, and Plaintiff did nothing further with respect to Patient A or B's health information. She claims she was on the "lookup" screen for only "one second" but did, in fact, see Patient A's information. DE #32-14, at 45, 50-51 (Dep. p. 144, 149-50).

---

[5] White first presented this account during much later unemployment proceedings. DE #32-4 (Davis Dep.), at 24.

Peace, who reported salient facts to BCH higher-ups, provides a sharply different story. A written statement, submitted on March 1, 2012, contains her complete description of events, *see* DE #32-8 (Peace Dep.), at 19:

> During night shift on 2/29/12 approx. 0000-0100 (3/1/12) Katherine White went on to HMS and entered [Patient A's] name. She stated to me, "did [Patient A] have her surgery today? I thought it was tomorrow. Do you know what 'MOP' means as her status?" I told her to get out of that screen and to never pull up anyone's info b/c she can get fired for it. She replied with "I will just tell them I was looking in there for someone with an "E" last name."

*Id.* at 45 (Dep. Ex. 1). According to Peace, prior to their conversation, White was seated at the nursing station and between tasks. *Id.* at 24. However, during her deposition testimony, Peace was unable to recall precisely what White might have been doing prior to accessing HMS GUI. *Id.* at 25-26. She also stated she did not know why White would have been in HMS GUI viewing Patient A's health information. *Id.* at 28, 39.

At the end of her shift on the morning of March 1, Peace reported her version of the night's events to Stoner Creek Director Vivian Hill. *Id.* at 41-43. After this initial report to Hill, Peace apparently met with Hill and BCH's Human Resource Director Roger Davis. *Id.* This prompted Peace to provide the referenced written statement.[6] *Id.* That same morning, Hill notified Ann Terrell, BCH's Health Information Management Director and HIPAA Officer, of White's alleged violation. DE #32-5 (Terrell Dep.), at 6. Terrell approached BCH's deputy local security coordinator Lona Sadler to run a security audit report regarding White's activity on HMS GUI during her February 29 shift. *Id.*; DE #32-7 (Sadler Dep.), at 32. The audit report, part of the system's designed capability,

---

[6] In his deposition, Davis stated he did *not* interview Peace. DE #32-4 (Davis. Dep.) at 18. This discrepancy between Davis and Peace's deposition testimony remains unresolved but is not consequential in the Court's view.

showed that White, consistent with Peace's assertions, accessed a search result screen that displayed the name, patient number, admission date, discharge date, billing date, and hospital code for Patient A.[7] DE #32 (Sadler Dep.), at 17, 68-69 (Dep. p. 17, Ex. 4). Upon receipt of the audit report, HIPAA Officer Terrell and HR Director Davis preliminarily determined that White had violated BCH's patient privacy policies and HIPAA. DE #32-4 (Davis Dep.), at 15.

On March 5, 2012, Davis,[8] Terrell, Hill, and BCH's Chief Nursing Officer Brian Springate met with White to discuss the allegation and investigation. DE #32-14 (White Dep.), at 76 (Dep. p. 175); DE #32-4 (Davis Dep.), at 7. Terrell (or someone) read Peace's statement aloud, DE #32-5 (Terrell Dep.), at 14, and informed White of the audit report. DE #32-14, at 79 (Dep. p. 178). White responded that she "did nothing wrong," but did not counter the allegations factually or reference the Patient B justification. *Id.* At the meeting, Davis alleged and concluded that White had improperly accessed Patient A's medical records and committed a blatant HIPAA violation. *Id.* at 81 (Dep. p. 180); DE #32-4 (Davis Dep.), at 34. The meeting lasted between ten and fifteen minutes. DE #32-4 (Davis Dep.), at 16. At the conclusion of the meeting, BCH staff present made a collective decision to terminate White. *Id.* at 46. Davis confirmed the termination via letter. *Id.* at 129.

---

[7] Again, White does not dispute that she accessed this information; she disputes how and why the access happened and the characterization of impropriety. *See* DE #32-14 (White Dep.), at 45, 51 (Dep. pp. 144, 150).

[8] Davis had told White not to report for an interim shift but to be at BCH for the March 5 meeting. She sensed but did not know the reason for being "in trouble." DE #32-13, at 52.

Following termination, White filed a claim for unemployment compensation. DE #32-15 (White Dep.), at 43 (Dep. Ex. 9).[9] As part of an appeal of the Kentucky Unemployment Insurance Commission's (KUIC) initial grant of benefits to White, Davis authored a letter stating, after a recitation of BCH's version of the events leading to termination: "Ms. White clearly violated HIPAA. She knowingly conducted a search for records she had no reason to view." DE #32-4 (Davis Dep.), at 124 (Dep. Ex. 5).

White sued BCH in state court, principally alleging defamation via statements made in the termination meeting and to the KUIC. DE #1-1 (State Court Record), at 1-4. BCH removed on diversity, and the Court now addresses the pending dispositive motion.

The Court finds that Kentucky law protects BCH's communications and deliberations concerning the fateful leap day computer access by White. She may or may not have queried for an improper purpose—that is a question of fact contested and not here resolved—but BCH acted properly on the information it had. Kentucky conclusively shields, via a qualified privilege, BCH's agents' pertinent communications within the employment discipline process. Additionally, Kentucky statutorily cloaks with immunity the KUIC communications. Finally, to the extent White presents an IIED claim, the claim has fatal flaws. BCH is entitled to summary judgment, and the Court **GRANTS** its motion (DE #32).

---

[9] The KUIC ultimately denied White's claim for unemployment benefits. This led to White filing an action in Bourbon County Circuit Court against the KUIC styled *Katherine White v. Kentucky Unemployment Insurance Commission, Division of Unemployment Insurance and Bourbon Community Hospital*, Case No. 12-CI-240. *See* DE #1-1 (State Court Record), at 23. The outcome of the unemployment action is not in the record or pertinent to the analysis.

## II.    Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would

be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp. v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## III.  Analysis

### A.  Defamation

White contends that BCH "alleged that Plaintiff had wrongfully accessed patient records without a legitimate basis for doing so, thereby violating hospital policy, Federal law (HIPPA) [sic] and the privacy rights of certain patients" and then "published its false allegations to co-workers and others in Bourbon County and Central Kentucky health care communities . . . [and] in resisting her lawful attempt to obtain unemployment

benefits following her wrongful discharge." DE #1-1, at 1-2. In its motion, BCH focuses

defensively on two instances where it allegedly defamed Plaintiff by publishing "false

allegations": (1) during the March 5, 2012, termination meeting and (2) in Davis's letter

to the KUIC. DE #32-1 (Memorandum in Support), at 2. Plaintiff does not contest this

characterization of the publications at issue in her claim, *see* DE #34-1 (Corrected

Response), at 15 ¶ 2, 20-21, and she does not cite or rely on additional instances of

publication. The Court, therefore, cabins its analysis accordingly.

Relying on Kentucky law[10], BCH presents four arguments against the defamation

theory: 1) the alleged defamatory statements are true; 2) BCH is entitled to a qualified

privilege because the statements occurred in the employment context; 3) statements made

to the KUIC cannot be actionable pursuant to KRS § 341.190(6); and 4) the alleged

defamatory statements are absolutely privileged opinion. Because qualified privilege

decides the case for BCH regarding the March 5 meeting, the Court need not

conclusively address its other arguments.[11]

---

[10] Both sides rely only on Kentucky law; the Court thus, without separate choice of law analysis, treats the matter as governed by the substantive law of the Commonwealth in this removed diversity case. *Erie Railroad. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *see also Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002) ("In federal diversity actions, state law governs substantive issues[.]").

[11] BCH's third argument, which White seems to concede, *see* DE #34-1 (Corrected Response), at 21, knocks out the KUIC event. KRS § 341.190(6) states in relevant part: "No information or records held confidential under subsection (3) of this section shall be the subject matter or basis for any suit for slander or libel in any court[.]" *See* § 341.190(3) ("Information obtained from an employing unit or individual . . . [is] confidential and shall not be published or be open for public inspection[.]"). The plain language of the statute forecloses any claim based on the Davis letter to the KUIC. *See Smith v. Appalachian Reg'l Healthcare, Inc.*, 2009 WL 366609, *5 n.4 (E.D. Ky. Feb. 12, 2009); *see also Sams v. Wal-Mart Stores E., LP*, 2010 WL 4740330, at *3 (Ky. Ct. App. November 24, 2010) (applying qualified privilege to KUIC proceedings: "Additionally,

Under Kentucky law, the elements of a defamation[12] claim are: "(a) a false and

defamatory statement concerning another; (b) an unprivileged publication to a third

---

our Court recently applied this rule expressly to statements made to the Kentucky Unemployment Insurance Commission.") (citing *Hawkins v. Miller*, 301 S.W.3d 507, 509 (Ky. Ct. App. 2009)).

     BCH's fourth argument, that statements by BCH were "pure opinion," rests on shakier ground. Assuming that the alleged defamatory statements occurred in the form of opinion, which is debatable, *see* DE #32-4 (Davis Dep.), at 34, 124 (Dep. p. 34, Ex. 5), an opinion statement "is actionable only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion." *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989) (quoting Restatement (Second) of Torts § 566 (1977)) (quotation marks omitted). The Court "must determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts which may justify the expressed opinion about the undisclosed facts." *Id.* Essentially, "if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability." *Id.* The basic characterizations at issue—that White violated HIPAA and BCH privacy policies—are heavily, indeed essentially, factual. Further, even a true or "pure" opinion on disclosed facts does not protect the *facts themselves* from being actionable (if defamatory). Finally, the record shows, that as to the collective decision at BCH (and relative to the termination meeting), the underlying facts were not universally available to everyone in the room. The Court, while it does not resolve the argument here, does not find the opinion argument one that disposes of the claim in BCH's favor. *See, e.g.*, *Cromity v. Meiners*, — S.W.3d —, 2015 WL 5634420, at *3 (Ky. Ct. App. September 25, 2015), *petition for discretionary review filed*, No. 2015-SC-000621 (Ky. November 2, 2015) ("Still, as discussed in the above hypothetical, even if a speaker discloses the facts on which he bases his opinion, the statement may nonetheless be defamatory if the disclosed facts are incomplete, incorrect, or if his assessment of them is erroneous." (citing *Milkovich v. Lorain Journal Co.*, 110 S. Ct. 2695, 2705-06 (1990))); *id.* (noting that "opinion" could be "actionable if [speaker] failed to state the facts in support of his opinion, failed to give a complete rendering of the facts, or gave facts that were provable as false."); Restatement (Second) of Torts § 566 (1977) ("(1) If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of false and defamatory facts, he is subject to liability for the factual statement but not for the expression of opinion."). The Court cites *Cromity* only to illustrate the point, not as final precedent. BCH does not convince the Court that the opinion argument is dispositive.

[12] "Defamation by writing and contemporary means analogous to writing . . . is libel. Defamation communicated orally is slander." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004) (quoting 2 Dan B. Dobbs, The Law of Torts, § 401 at 1120 (2001)). The distinction between libel and slander does not affect the *prima facie* case required for the tort. *See id.*

party[13]; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2015) (quoting Restatement (Second) of Torts § 558 (1977)) (quotation marks omitted). Stated more simply, the *prima facie* case for defamation requires proof of: "1. defamatory language 2. about the plaintiff 3. which is published and 4. which causes injury to reputation." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004) (citing *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981)). Defamatory language is actionable *per se* "when there is a conclusive presumption of both malice and damage." *Toler*, 458 S.W.3d at 282 (quoting *Stringer*). Kentucky courts categorize communications that involve false allegations of unfitness to perform a job as *per se* actionable. *Id.*

However, in some situations, "otherwise defamatory-per-se communications are allowed because the societal interest in the unrestricted flow of communication is greater than the private interest." *Id.* This qualified privilege[14] applies in the employment context to statements "relating to the conduct of employees" that are made by a party with an interest in the communication "to another having a corresponding interest . . . if made in good faith and without actual malice." *Stringer*, 151 S.W.3d at 796. The qualified privilege negates the ordinary presumption of the falsity of a defamatory statement. *Toler*, 458 S.W.3d at 283. The "question" of privilege is one of law for the Court. *See Landrum v. Braun*, 978 S.W.2d 756, 757-58 (Ky. Ct. App. 1998). A matter properly

---

[13] Kentucky law considers the statements made during the March 5, 2012, termination meeting as published for purposes of a defamation claim. *See Toler*, 458 S.W.3d at 282, n.8.

[14] Raised by BCH in its Answer. DE #1-1, at 16 (Ninth Defense).

within the employment relationship supports application of the qualified privilege. *See, e.g.*, *id.* (recognizing privilege "in 'matters involving communications between employees in the chain of command[.]'") (quoting *Wyant v. SCM Corp.*, 692 S.W.2d 814 (1985)); *Dermody v. University of Louisville*, 2013 WL 761485, at *2 (Ky. Ct. App. March 1, 2013) ("Statements made in context of the employment relationship are qualifiedly privileged."). Here, all participants in the March 5 meeting were within, and reflected input from, the BCH hierarchy pertinent to the possibility of improper medical records access by a Stoner Creek staff member. The only purpose for the statements fairly indicated by the record was the institutional assessment of whether a HIPAA or privacy policy violation had occurred. The chain of command and employment-related communications relevant here receive qualified protection. *See Dermody*, 2013 WL 761485, at *2 (applying privilege because, "The statements were made in the context of an employment disciplinary proceeding and shared only with those required to review the records.")

White does not dispute that the qualified privilege initially applies in this case; she contends BCH waived or abused the protection. DE #34-1, at 2, 19-20. Because the privilege undoubtedly applies, White thus faces the burden of defeating the privilege. To do so, she must show "both actual malice and falsity." *Toler*, 458 S.W.3d at 283. Clearly, "the burden of showing such abuse of privilege is the plaintiff's[.]" *Id.* at 284.

Plaintiff spends much of her response attempting to establish the falsity of BCH's statements. White contends that her access to Patient A's protected health information via HMS GUI was proper. Per Plaintiff, she searched the HMS GUI system as part of her normal work duties as an after-hours behavioral health technician. DE #34-1 (Corrected

13

Response), at 8-9. White testified that "[Patient B] called inquiring about getting – you know, said he had been a patient at Stoner Creek in the past and that he would like to come in for detox and that's when, you know, I went to GUI to look and he said he would call me back[.]" DE #32-14 (White Dep.), at 42 (Dep. p. 141). She searched (per her described training) the system by Patient B's surname—the same surname as Patient A. *Id.* As White details by reference to the deposition testimony of BCH employees, HMS GUI is designed to populate *at least seven* entries when searched and pulls data from across the hospital. DE ##32-4 (Davis Dep.), at 71-72; 32-7 (Sadler Dep.), at 18. Further, Plaintiff argues—and BCH employees seem to agree—that the viewing of other patients' health information does not violate BCH privacy policies or HIPAA when viewed incidental to a legitimate search. DE #34-1, at 17; *see* DE #32-4 (Davis Dep.), at 12-15; DE #32-7 (Sadler Dep.), at 22-24.[15]

BCH initially argues that summary judgment is appropriate because the statements—that Plaintiff inappropriately accessed protected health information—were true.[16] DE #32-1 (Memorandum in Support), at 8-9. Specifically, it cites the undisputed facts that BCH policy prohibits employees from accessing "any patient information other than that necessary to perform his or her job," Patient A was not a patient at the Stoner Creek facility where Plaintiff worked, and Plaintiff's admitted (as documented) viewing of Patient A's protected health information via HMS GUI. *Id.* Coupled with the assertion that Peace's letter report and deposition testimony indicate Plaintiff accessed the records

---

[15] The Court wonders about, but does not judge, the propriety of a system that by design, and as foreseeably used, yields a query return greater than necessary, particularly as to distinct surnames.

[16] Truth is a silver-bullet defamation defense. *See Toler*, 458 S.W.3d at 283 n.19 ("As is always the case with regard to defamation, truth remains an absolute defense even in the privilege context.")

for purely personal reasons, Defendant argues conclusive truth of the alleged defamatory statements.

The propriety of White's access surely is a contested fact. White's access to Patient A's records was either the unauthorized access of an employee checking up on the medical procedures of a friend and colleague or was legitimately incidental to her duties as a behavioral health technician, which include patient intake on the evening shift, DE #32-8 (Peace Dep.), at 29. The competing accounts contained in the sworn deposition testimony of White and Peace create a factual issue as to the alleged defamatory statements' truth. If White's version of events is accurate, then HMS GUI pulled up Patient A's records when White properly queried the surname shared by Patient A and Patient B. The computer audit is logically corroborative of both versions. Thus, the record does not support summary judgment based on the truth defense.

However, a demonstrated issue of fact regarding falsity is immaterial absent a corresponding fact issue as to malice. In order to show BCH abused the qualified privilege and acted with "actual malice," White must show: "(1) the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; (2) the publication of the defamatory matter for some improper purpose; (3) excessive publication; or (4) the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged." *Toler*, 458 S.W.3d at 284 (quoting Restatement (Second) of Torts § 596 cmt. a (1977)) (internal quotation marks omitted). "[The statement's] falsity alone will not demonstrate abuse of the privilege that attached[.]" *Harstad v. Whiteman*, 338 S.W.3d 804, 813 (Ky. Ct. App.

2011). "If the plaintiff fails to adduce such evidence sufficient to create a genuine issue of fact, qualified privilege remains purely a question of law[.]" *Id.* at 811.

White alleges that BCH abused its qualified privilege by its "reckless disregard as to the falsity of the defamatory matter." DE #34-1 (Corrected Response), at 19. Outside of arguing the general falsity of the statements, which in and of itself is insufficient to demonstrate abuse, Plaintiff focuses the reckless disregard argument on what she characterizes as BHC's, and particularly HR Director Davis's, shoddy investigation into the truth of her alleged violation. *Id.* at 11-14. She cites Davis's apparent lack of knowledge regarding the HMS GUI system, his failure to interview Peace, security coordinator Sadler, or Patient A, the general brevity of the termination meeting, and his failure to investigate Plaintiff's alternative version of events. *Id.*

None of these arguments raises a triable issue on malice. "Reckless disregard means the speaker either (1) entertained serious doubts as to the truth or falsity of the statements or (2) had a high degree of awareness as to whether the statement was probably false." *Toler*, 458 S.W.3d at 289 (internal quotation marks omitted). As much as Plaintiff may criticize BCH's investigation as deficient, she does not and cannot dispute the underlying facts of the investigation that did occur as of March 5. Following Peace's originating report to Hill, HIPAA Officer Terrell became aware of the alleged violation. Either Davis or Hill obtained a written account from Peace. Terrell confirmed White's access of Patient A's data on HMS GUI via security officer Sadler, who conducted an audit that produced an objective audit trail. After confirming (at least in significant part) Peace's report via Sadler's audit, Davis called Plaintiff to a meeting to convey the allegation. At no point in this process did BCH or its officers receive information casting

any doubt on the validity of their perceptions. *See Harstad*, 338 S.W.3d at 813. At the time the alleged defamatory statements occurred, Plaintiff had offered nothing to suggest an innocent alternative.[17] White has not presented any "evidence that would incline a reasonable person to believe that [Defendant's] perception was not simply the product of mistaken observation, but the result of malice, i.e., some evidence that [Defendant] knew [it] was lying or making wholly unfounded statements without regard to their truth or falsity." *Toler*, 458 S.W.3d at 286. White does not cite any facts contained in the record demonstrating that BCH knew its statements regarding her alleged HIPAA violation were false or had reason to doubt their truth. On this record, only Plaintiff had information that might call into question the veracity of BCH's statements; she was silent until well after statement publication. White fails to produce sufficient evidence to create a genuine issue of material fact regarding actual malice. The qualified privilege remains intact, dooms White's defamation claims, and mandates judgment in BCH's favor.

The Court stresses that the malice assessment focuses on what BCH fairly knew when it made the March 5 statements. The Peace report detailed troubling, obviously HIPAA-violative, and deceptive conduct. The audit trail unequivocally confirmed that White had, indeed, accessed a lookup screen including Patient A's information. That data

---

[17] White makes much of the fact that the termination meeting lasted under 15 minutes and she did not have, in her mind, a sufficient opportunity to marshal evidence against BCH's accusation. The process may have been imperfect, as most investigations are. However, the Court's role here is to apply the qualified privilege and assess for abuse, not to act as HR overseer for BCH. White might snipe at Davis for failing to interrogate Peace or failing to understand the nuances of HMS GUI, but her criticisms simply suggest that Davis could have done more to get a fuller picture. The criticisms in no way impugn Davis's good faith perception of the facts available to him at the time. Critically, of course, Davis drew inferences in a situation where White offered no contrary factual explanation for what actually had occurred mere days prior, at least nothing beyond a generic "I did nothing wrong." This undoubtedly fortified Davis's negative take on the reason for White's record access.

included protected health information.[18] Various levels of BCH's chain of command had input, to include persons with IT expertise (Sadler), Stoner Creek operational expertise (Hill), HIPAA expertise (Terrell) and HR expertise (Davis). White knew she was in some type of trouble when told by Davis not to report for her next scheduled shift following the leap day events. She also knew, at the time of or during the March 5 meeting, the particulars of the accusation and the identity of Peace, the primary complainant. She testified in this case that she was aware, at that time, of the alleged Patient B facts. DE #32-14 (White Dep.), at 182-83 (Q: "So you knew at that time that the reason you had accessed Patient A's record, at least in your mind, was because of this call from Patient B." Answer (after colloquy and rereading): "Yes."). Inexplicably, White was too "aghast," DE #32-14, at 80 (Dep. p. 179), to inform Davis of her exculpatory story. The Court understands that the meeting must have been tense, but BCH was entitled to treat White's muted response in the face of specific allegations as confirmatory.[19]

BCH actors honestly and rationally processed the data in hand and reached collective conclusions about that data. The determination of a HIPAA violation, whether ultimately accurate or not, rested solidly on a foundation of perceived fact. *See Calor v.*

---

[18] The Court would include all of the information as "protected health information," and the parties do not really debate that definition. The screen included Patient A's name (the ultimate identifying information), but also particulars of treatment such as dates of admission and discharge as well as the general hospital area involved. Patient A's "patient number" also was on the screen. While the sensitivity of this information might not be as great as detailed file materials (such as progress notes or test results), HIPAA protects information of this type. Whether, when, and in what area of BCH Patient A had been a patient is private and protected health information.

[19] Davis claimed he gave White a full chance to explain. DE #32-4, at 16. White contends she "wasn't even allowed to explain or, you know, give any rebuttal." DE #32-13, at 53 (Dep. p. 53). White later, however, admitted that she responded by saying, "I did nothing wrong" and asked about retrieving her property. DE #32-14, at 79 (Dep. p. 178). Irrespective of meeting tone, White, the only holder of information about her intent, did not provide any factual reason to doubt BCH's perception of a HIPAA violation.

*Ashland Hosp. Corp.*, 2011 WL 4431143, at *7 (Ky. September 22, 2011) ("And, unless the statement is one made in reckless disregard of the available facts,[20] the conditional privilege is based upon one's reasonable belief—not whether the statement was incorrect."); *Duncan v. Lifeline Healthcare of Somerset, LLC*, 2013 WL 844186, at *3 (Ky. Ct. App. March 8, 2013) (noting no evidence of bad faith or malice—"whether Duncan did or did not falsify her timesheets is not material"). White wishes BCH had perceived the situation differently, but its views were honestly held and reached; Plaintiff tenders no proof that any BCH actor in the March 5 event "knew she [or he] was lying or making wholly unfounded statements without regard to their truth or falsity." *Harstad*, 338 S.W.3d at 813.

Where proof impugning the qualified privilege is inadequate to create a factual dispute, summary judgment is proper[21]; that is the case here.

### B.  Intentional Infliction of Emotional Distress (IIED)

"To make out a claim of IIED, the following elements must be proved: (1) the wrongdoer's conduct must be intentional or reckless; (2) the conduct must be outrageous and intolerable in that it offends against generally accepted standards of decency and morality; (3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress must be severe." *Gilbert v. Barkes*, 987

---

[20] Because the lookup screen contained sensitive information, Davis's depth of knowledge or misunderstanding of HMS GUI (and White's degree of access) is not material.

[21] Thus, "[a]lthough the jury normally determines whether a privilege was abused, a motion for summary judgment is appropriate when the record shows no facts which would lead to the conclusion that the Appellees acted with malice." *Cargill v. Greater Salem Baptist Church*, 215 S.W.3d 63, 68 (Ky. Ct. App. 2006). White makes no factual or legal arguments concerning other ways an actor might abuse the privilege (such as excessive publication, publication with an improper purpose, or publication not related to the privilege basis).

S.W.2d 772, 777 (Ky. 1999). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Highlands Hosp. Corp. v. Preece*, 323 S.W.3d 357, 368 (Ky. Ct. App. 2010) (quoting *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990)). "Termination from employment . . . is insufficient to constitute outrageous conduct sufficient to support a claim for intentional infliction of emotional distress." *Id.*

To the extent Plaintiff attempts a claim for intentional infliction of emotional distress,[22] she has not produced evidence sufficient to establish that any BCH conduct was "outrageous and intolerable." Further, IIED is a gap filler, and Kentucky law does not allow White to duplicate the subject matter of her recognized defamation tort (which would allow recovery of emotional distress damages, if proven) with an IIED theory. *See Grace v. Armstrong Coal Co.*, 2009 WL 366239, at *3 (W.D. Ky. Feb. 13, 2009) (referencing defamation and stating: "This means that IIED is not a valid cause of action in Kentucky where the alleged conduct makes out a claim for another tort for which emotional distress damages are available."). Of course, as noted, White offers no expert proof on the degree of any emotional harm, another likely fatal flaw to any IIED theory here. *See, e.g.*, *MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015) (applying *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012) to IIED claim: "This

---

[22] Whether Plaintiff's complaint actually asserts an IIED claim is unclear. In her complaint, Plaintiff claims "mental anguish, humiliation, and injury to her feelings" as a result of the allegedly defamatory statements. DE #1-1, at ¶ 11(b). However, as even Defendant argues, damages related to emotional distress are recoverable in a suit for defamation. *See Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 274 (Ky. Ct. App. 1981). Nothing in the complaint suggests Plaintiff asserted a claim for emotional distress outside the bounds of her defamation claim, and White's briefing does not expend any effort to spare the cause of action.

Court joins the latter group in holding *Osborne*'s requirement for expert testimony is limited to NIED and intentional infliction of emotional distress claims.").

For all of these reasons, the Court also grants summary judgment as to any IIED claim.

**IV.     Conclusion**

For the forgoing reasons, the Court **GRANTS** DE #32. The Court will enter a separate Judgment.[23]

This the 15th day of January, 2016.

Signed By:

*Robert E. Wier*  *REW*

**United States Magistrate Judge**

---

[23] The Court also **SEALS** the deposition transcript page that follows page 4 of White's uncorrected and corrected memoranda, DE ##34, at 5; 34-1, at 5, which improperly reveals the name of Patient A.